**REVISED November 21, 2016**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

November 17, 2016

Lyle W. Cayce
Clerk

No. 16-30009

ROBERT DEPERRODIL,

Plaintiff - Appellee

v.

BOZOVIC MARINE, INCORPORATED,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Louisiana

Before JOLLY, BARKSDALE, and SOUTHWICK, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

In this maritime-tort action for injuries arising out of plaintiff's being taken to a work site on a vessel operated by defendant, a third-party tortfeasor, primarily at issue is whether the collateral-source rule allows plaintiff to recover the unpaid, written-off portion of his billed medical expenses, when the remaining, paid portion of the billed expenses was through workers'-compensation insurance provided by his non-tortfeasor employer, pursuant to the Longshore and Harbor Workers' Compensation Act (LHWCA). Also at issue are: whether liability can be imposed on the vessel's owner for injuries

suffered in rough seas when the passenger knew the weather conditions and risks; and whether a district court may use an above-average work-life expectancy to calculate future lost wages.  AFFIRMED in part; VACATED in part; REMANDED.

## I.

Robert dePerrodil was injured while aboard the M/V THUNDERSTAR, a 65-foot crewboat owned and operated by Bozovic Marine, Inc.  DePerrodil, a 70-year-old oilfield consultant with more than four decades of oilfield experience, worked for Petroleum Engineers, Inc. (PEI).  PEI chartered the vessel, operated by Captain Bozovic, to take dePerrodil from Venice, Louisiana, to his work site on an offshore platform.

When dePerrodil and Captain Bozovic realized dePerrodil would not be able to board the platform because the liftboat was not present, dePerrodil asked Captain Bozovic to return to port.  Facing rough seas while returning, Captain Bozovic steered the vessel over an eight-to-ten-foot wave at full throttle; but, he did not decelerate upon reaching the crest.  The vessel fell into the wave's trough, causing dePerrodil (who was standing in the wheelhouse) to fall to the floor.  He suffered, *inter alia*, injuries to his back.

Pursuant to the LHWCA, PEI carried workers'-compensation insurance for dePerrodil.  *See* 33 U.S.C. § 932(a)(1).  That insurer for PEI paid $57,385.50 for dePerrodil's medical expenses.

Following a bench trial for this action based on admiralty jurisdiction, the court concluded Bozovic Marine was negligent for:  failure to "request that dePerrodil go to the passenger area of the vessel"; failure to stay apprised of the weather conditions; and "erratic operation" of the vessel.  *DePerrodil v. Bozovic Marine, Inc.*, No. 6:13-cv-849, 2015 WL 8542829, at *3 (W.D. La. 10 Dec. 2015).  As a result of the court's concluding dePerrodil was comparatively negligent for staying in the wheelhouse, instead of moving independently to

the passenger compartment, dePerrodil received 10% liability; Bozovic Marine, 90%. *Id.* at *4.

In awarding dePerrodil $984,395.52, *id.* at *7, the court held, *inter alia*, the collateral-source rule barred any discount of the medical expenses PEI and its insurer were billed, but not required to pay. *Id.* at *4–5. Accordingly, the court awarded the full amount of those expenses billed for dePerrodil's treatment, $186,080.30, even though only approximately one-third of them were paid. *Id.* at *7. And, in calculating future lost wages, the court used an above-average work-life expectancy of 75 years, as recommended by an expert vocational-rehabilitation counselor. *Id.* at *6–7.

## II.

Maritime law governs this action. *See Exec. Jet Aviation, Inc. v. City of Cleveland, Ohio*, 409 U.S. 249, 253 (1972). Courts exercising maritime jurisdiction apply general principles of negligence law to tort actions. *See, e.g.*, *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000); *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980).

## A.

Regarding Bozovic Marine's maintaining the court erred in finding it liable for 90% of dePerrodil's injuries, the determination of a legal duty is reviewed *de novo*. *Theriot v. United States*, 245 F.3d 388, 394–95 (5th Cir. 1998). On the other hand, findings of negligence, including causation, are reviewed for clear error. *See Trico Marine Assets, Inc. v. Diamond B Marine Servs., Inc.*, 332 F.3d 779, 786 (5th Cir. 2003). Accordingly, the conclusion that Bozovic Marine owed a duty of reasonable care is reviewed *de novo*; the findings of fact, pursuant to the proper legal standard, for clear error.

In a bench trial, the court must make separate findings of fact and conclusions of law. Fed. R. Civ. P. 52(a)(1). "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and

the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6). "A finding is clearly erroneous when the appellate court, viewing the evidence in its entirety, is left with the definite and firm conviction that a mistake has been made." *Bertucci Contracting Corp. v. M/V ANTWERPEN*, 465 F.3d 254, 258–59 (5th Cir. 2006) (internal quotation marks omitted).

1.

For the following reasons, the proper legal duty was applied. *See DePerrodil*, 2015 WL 8542829, at *2–3. As the court stated, vessel owners owe their passengers a duty of reasonable care under the circumstances. *See Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959). Our court has held "shipowners, relatively speaking, are held to a high degree of care for the safety of their passengers". *Smith v. Southern Gulf Marine Co. No. 2*, 791 F.2d 416, 420 (5th Cir. 1986). Among the relevant factors are the type of carrier, the crew's experience, the risk involved, defendant's degree of control over passengers, and defendant's ability to take precaution against the risk. *See id.* at 421. Because the court properly identified Bozovic Marine's legal duty before evaluating liability, its negligence finding is reviewed for clear error.

As discussed, the court found Captain Bozovic breached his duty by: (1) failing to tell dePerrodil to move to the passenger area (failure to warn); (2) failing to stay apprised of the relevant weather conditions; and (3) operating the vessel erratically. *DePerrodil*, 2015 WL 8542829, at *3. Bozovic Marine contends it did not breach its duty of reasonable care because the risks were open and obvious to dePerrodil: he was a longshoreman with four decades of experience in the Gulf; knew the seas were rough; and had a clear view of the weather conditions from the wheelhouse. Therefore, Bozovic Marine

4

maintains, the captain did not have a duty to protect dePerrodil from the open-and-obvious risk of losing his balance in rough seas.

A vessel owner does not need to warn passengers or make special arrangements for open-and-obvious risks. *See Massey v. Williams-McWilliams, Inc.*, 414 F.2d 675, 678–79 (5th Cir. 1969); *Superior Oil Co. v. Trahan*, 322 F.2d 234, 237 (5th Cir. 1963); *see also Counts v. Lafayette Crewboats, Inc.*, 622 F. Supp. 299, 301 (W.D. La. 1983). For example, in *Superior Oil*, our court found a seaman comparatively negligent when he attempted to board a vessel by jumping from another deck. 322 F.2d at 235. Critical to the seaman's negligence was "that [he] was an experienced seaman and should have been fully cognizant of the danger involved". *Id.* at 237. Thus, failure to avoid an obvious risk led to the finding of comparative negligence. *See id.*

The case at hand is distinguishable because the court found Captain Bozovic liable based, in part, on his specific operation of the vessel, rather than his failure to warn dePerrodil of the risk. Captain Bozovic testified he watched the prior evening's weather report on television, but did not continue to monitor weather conditions on the date he ferried dePerrodil. DePerrodil testified: Captain Bozovic made him aware of the 25 mile-per-hour winds; dePerrodil could see it "was choppy"; he had been on a vessel before when the Gulf was rough; and he was unconcerned about the weather conditions.

Once underway, dePerrodil was standing in the wheelhouse, helping Captain Bozovic look for the liftboat. When they realized dePerrodil would not be able to accomplish his job, he asked the captain to return to port. Captain Bozovic turned the vessel around, heading back into the wind and rougher seas, telling dePerrodil to "hold on". Confronted with four-to-six-foot waves, Captain Bozovic began accelerating up the swells and decelerating down.

5

DePerrodil's expert testified this was the proper method for operating the vessel in high seas.

Soon thereafter, however, an eight-to-ten-foot wave approached the vessel. Captain Bozovic accelerated to full throttle up the swell, but did not decelerate after cresting the wave. The vessel dropped into the resulting trough, and dePerrodil and a deckhand "went weightless". DePerrodil fell to the floor, injuring, *inter alia*, his back. Captain Bozovic then decreased speed and idled back to port without further incident.

The court did not clearly err in concluding, *inter alia*, that Captain Bozovic breached his duty to dePerrodil by cresting the eight-foot wave at full throttle. The failure to decelerate was the proximate cause of dePerrodil's injuries. This operational error is underscored by Captain Bozovic's ability to idle the vessel back to port after the accident. That is to say, but for Captain Bozovic's operation of the vessel, dePerrodil would not have suffered his injuries.

The accident would have occurred regardless of whether dePerrodil knew the risks of rough seas. Notwithstanding dePerrodil's being aware of the weather, Captain Bozovic's operation of the vessel cannot be considered an "open and obvious" risk to dePerrodil. As the court stated, "inclement weather does not absolve a captain from operating his vessel in a reasonably prudent manner". *DePerrodil*, 2015 WL 8542829, at *3. Therefore, as noted, it was not clear error to find Bozovic Marine breached its duty of reasonable care under these circumstances. Because the operational negligence is sufficient to sustain Bozovic Marine's liability, it is unnecessary to consider the court's other bases for liability: failure to warn; and failure to monitor the weather.

2.

The court's apportionment of liability is also reviewed for clear error. *Barto v. Shore Constr., L.L.C.*, 801 F.3d 465, 471 (5th Cir. 2015). It found

dePerrodil negligent for remaining in the wheelhouse, instead of moving independently to the passenger area, and assigned him 10% liability. *DePerrodil*, 2015 WL 8542829, at *4. DePerrodil does not dispute this finding. Bozovic Marine, on the other hand, maintains the parties should, at least, be equally liable.

The evidence showed dePerrodil was in the wheelhouse to look for his work site and did not intend to go below once they were in rough seas (nor was he told to leave the wheelhouse). At trial, the parties did not present evidence about whether the injury would have occurred had dePerrodil been in the passenger area. Based on the trial record, including Captain Bozovic's control over the vessel, it was not clear error to assign 90% of the liability to Bozovic Marine.

B.

Bozovic Marine maintains the court erred in applying the collateral-source rule and awarding dePerrodil medical expenses as billed, rather than paid. The application of the rule is reviewed *de novo*. *Johnson v. Cenac Towing, Inc.*, 544 F.3d 296, 304 (5th Cir. 2000).

The collateral-source rule bars a tortfeasor from reducing his liability by the amount plaintiff recovers from independent sources. *Davis v. Odeco, Inc.*, 18 F.3d 1237, 1243 (5th Cir. 1994). It is a substantive rule of law, as well as an evidentiary rule (disallowing evidence of insurance or other collateral payments that may influence a fact finder). *Id.*

In its simplest form, the rule asks whether the tortfeasor contributed to, or was otherwise responsible for, a particular income source. *See Bourque v. Diamond M. Drilling Co.*, 623 F.2d 351, 354 (5th Cir. 1980). If not, the income is considered "independent of (or collateral to) the tortfeasor", and the tortfeasor may not reduce its damages by that amount. *Davis*, 18 F.3d at 1243. In practice, the rule allows plaintiffs to recover expenses they did not

personally have to pay. *See id.* Without the rule, however, a third-party income source would create a windfall for the tortfeasor. *Id.* at 1244. Thus, the rule reflects a policy determination: better a potential windfall for the injured plaintiff than the liable tortfeasor. *See* Restatement (Second) of Torts § 920A cmt. b. (Am. Law Inst. 1979) ("[I]t is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor".).

The analysis is complicated when a tortfeasor contributes to a portion of the collateral source. *See, e.g., Davis*, 18 F.3d at 1244. For instance, an employer-tortfeasor may pay part of an employee's health-insurance plan. *See Johnson*, 544 F.3d at 305. In that situation, courts ask whether the collateral source is a bargained-for fringe benefit. *See id.* If so, the fringe benefit is compensation to which the employee is already entitled; as a result, an employer cannot reduce its liability by paying employment compensation. *Davis*, 18 F.3d at 1244. Thus, bargained-for fringe benefits are considered collateral to an employer's liability. *Id.* On the other hand, when an employer obtains a liability-insurance plan, it is providing pre-accident insurance to protect itself from post-accident expenses. *See Phillips v. Western Co.*, 953 F.2d 923, 932 (5th Cir. 1992) (citing *Allen v. Exxon Shipping Co.*, 639 F. Supp. 1545, 1547–48 (D. Me. 1986)). There, the collateral-source rule does not apply. *See id.*

Courts, therefore, must determine whether a payment stems from a fringe benefit or a prophylactic protection against liability. As our court stated, the "[c]urrent application of the collateral source rule thus turns on the *character* of the benefits received, as well as the *source* of those benefits". *Davis*, 18 F.3d at 1244 (emphasis in original).

Here, the parties rely on a five-factor test from *Phillips* to determine whether the collateral-source rule applies to workers'-compensation insurance.

*Phillips*, 953 F.2d at 932. *Phillips* and its progeny, however, arise in the employer-tortfeasor context. *See, e.g.*, *Johnson*, 544 F.3d at 305–07; *Davis*, 18 F.3d at 1244–45; *Phillips*, 953 F.2d at 927, 932. The *Phillips* factors are applicable only when the tortfeasor contributes to the benefit. *See Johnson*, 544 F.3d at 304–05. PEI was neither negligent, nor responsible for, dePerrodil's injuries; rather, Bozovic Marine is a third-party tortfeasor. Accordingly, the *Phillips* analysis is inapposite, and the standard collateral-source rule asks whether the payment source was independent of the liable party. *See Davis*, 18 F.3d at 1243.

PEI's LHWCA insurer paid dePerrodil's medical expenses. Bozovic Marine played no role in securing that insurance coverage. Thus, the collateral-source rule applies, and Bozovic Marine is liable for the medical expenses the insurer paid on dePerrodil's behalf. (33 U.S.C. § 933 entitles insurers to subrogation for LHWCA payments.)

The question remains, however, whether the maritime collateral-source rule allows plaintiffs to recover the amount billed, or only the amount paid. As noted, dePerrodil was billed $186,080.30, but the insurer was only required to pay $57,385.50; the balance was written-off. Neither dePerrodil, PEI, nor its insurer were ever liable for the $128,694.80 write-off. (Along that line, citing Louisiana and California law, the court stated: "A plaintiff cannot recover economic damages for medical fees that the provider is precluded, either by agreement or by law, from collecting from the employer". *DePerrodil*, 2015 WL 8542829, at *5. But, notwithstanding its just-stated rule, and without further analysis, it awarded dePerrodil the amount initially billed, $186,080.30. *Id.* at *7.)

There is no direct authority regarding the treatment of written-off LHWCA medical expenses in the maritime-tort context. Consequently, we must look to persuasive authority, namely state and analogous maritime

authority. *See Manderson v. Chet Morrison Contractors, Inc.*, 666 F.3d 373, 381 (5th Cir. 2012) (reviewing prior state-law and maritime decisions). State laws differ as to their approach to written-off expenses in tort cases; within our circuit alone, three different rules prevail. In Mississippi, the collateral-source rule allows plaintiffs to recover write-offs. *See Wal-Mart Stores, Inc. v. Frierson*, 818 So. 2d 1135, 1139–40 (Miss. 2002) (allowing plaintiff to submit evidence of written-off Medicaid expenses). Texas, on the other hand, does not "allow recovery as damages of medical expenses a health care provider is not entitled to charge". *Haygood v. De Escabedo*, 356 S.W. 3d 390, 396 (Tex. 2012) (considering amounts charged in excess of Medicaid limits). In contrast to the rules in each of these two States, Louisiana allows write-off recovery if plaintiff provided consideration for the benefit or suffered a diminution in patrimony. *See Bozeman v. State*, 879 So. 2d 692, 705–06 (La. 2004).

In the maritime context, our court considered a similar issue in *Manderson*, 666 F.3d at 382. There, the question was, *inter alia*, whether the collateral-source rule allows recovery of written-off medical expenses when an employer paid the expenses as part of its maritime cure obligation. The *Manderson* court stated:

> [O]ur court has repeatedly held an injured seaman may recover maintenance and cure only for those expenses "actually incurred". *E.g.*, *Davis*, 18 F.3d at 1246; *Boudreaux v. United States*, 280 F.3d 461, 468 (5th Cir. 2002). Accordingly, the relevant amount is that needed to satisfy the seaman's medical charges. This applies whether the charges are incurred by a seaman's insurer on his behalf and then paid at a written-down rate, or incurred and then paid by the seaman himself, including at a non-discounted rate.

666 F.3d at 382. Based on this discussion, our court held it was error to award the amount charged, rather than paid. *Id.*

10

Although *Manderson* is not binding — it involved maritime cure, not a maritime tort or LHWCA insurance — it is the most applicable of the various approaches to write-offs. Moreover, its rationale is very persuasive because maritime cure and LHWCA insurance create similar obligations for employers.

Cure is a vessel-owner's long-established duty to pay medical expenses for seamen injured at sea. *Id.* at 380. It compels an employer to pay work-related medical expenses, regardless of "fault or negligence of the shipowner". *Bertram v. Freeport McMoran, Inc.*, 35 F.3d 1008, 1013 (5th Cir. 1994).

The LHWCA was enacted in part based on shortcomings of maritime cure. *See generally P.C. Pfeiffer Co. v. Ford*, 444 U.S. 69, 75, 78 (1979) (discussing Congressional intent behind the LHWCA). Longshoremen and harbor workers do not necessarily qualify for maritime maintenance and cure because a significant portion of their work is done on shore. *Id.* To cover these workers, Congress enacted the LHWCA, which incorporates and replaces several aspects of maritime common law. *See* 33 U.S.C. § 905 ("Exclusiveness of liability"); *P.C. Pheiffer*, 444 U.S. at 75 ("Congress intended that a worker's eligibility for federal benefits would not depend on whether he was injured while walking down a gangway or while taking his first step onto the land.").

The LHWCA requires employers to carry workers'-compensation insurance to pay for work-related injuries. 33 U.S.C. § 932. Like maritime cure, LHWCA creates a no-fault basis for paying a longshoreman's medical expenses. 33 U.S.C. § 904(b) ("Compensation shall be payable irrespective of fault as a cause for the injury."). When a third-party tortfeasor is responsible for the employee's injury, cure and LHWCA insurance function in the same manner: the employer (or its insurer) has an immediate duty to pay medical expenses even though it is not at fault. These similarities counsel that *Manderson* — prohibiting write-off recovery — provides the correct rule for both maritime cure and LHWCA maritime-tort cases.

In sum, LHWCA medical-expense payments are collateral to a third-party tortfeasor only to the extent paid; in other words, under those circumstances, plaintiff may not recover for expenses billed, but not paid. Therefore, the district court erred in awarding the full amount billed. Instead, the proper measure of those damages is the far lesser amount the insurer paid to cover dePerrodil's medical expenses: $57,385.50.

C.

Finally, Bozovic Marine asserts the court miscalculated dePerrodil's future lost earnings because it did not use the Bureau of Labor Statistics (BLS) work-life expectancy average. Damages calculations are findings of fact, reviewed for clear error. *Comar Marine, Corp. v. Raider Marine Logistics, L.L.C.*, 792 F.3d 564, 574 (5th Cir. 2015).

Courts use work-life expectancy data to calculate future earnings, unless there is evidence supporting a variation from the average. *E.g.*, *Madore v. Ingram Tank Ships, Inc.*, 732 F.2d 475, 478 (5th Cir. 1984). "Such an average is not conclusive. It may be shown by evidence that a particular person, by virtue of his health or occupation or other factors, is likely to live and work a longer, or shorter, period than the average." *Id.* (emphasis omitted).

According to BLS data, dePerrodil had a work-life expectancy of 72 years. At trial, however, dePerrodil presented a vocational-rehabilitation counselor as an expert witness. She interviewed dePerrodil on two occasions and reviewed his medical history. She concluded it was "very reasonable" dePerrodil would work until age 75; this conclusion was based on: dePerrodil's testimony that he and his wife had an agreement he would work until age 75; his work history; his earnings records; and his healthcare providers' recommendations for future treatment. DePerrodil's expert economist then provided the court with two calculations, one using BLS' age-72 work-life expectancy; the other, the vocational counselor's age-75 expectancy. With both

calculations before it, the court awarded future lost wages based on an age-75 retirement. *See DePerrodil*, 2015 WL 8542829, at *5–6.

Bozovic Marine points to two cases in which a court erred by using the plaintiff's stated retirement goal, rather than the BLS average. In *Madore*, the parties each presented expert testimony supporting a 25.8-year work-life expectancy for the injured seaman. 732 F.2d at 478. The calculations were based on the BLS average, and the parties presented no other evidence on the matter. *Id.* Nonetheless, the district court awarded lost-wage damages based on a work-life expectancy of 30 years (until the plaintiff turned 65). *Id.* Our court held this was error because the parties presented no evidence to justify a departure from the BLS average. *Id.*

Another district court chose an above-average calculation "in the middle" of the BLS projection and the Social Security retirement age of 67. *See Barto*, 801 F.3d at 475. There, the only relevant evidence was plaintiff's testimony he planned to work until he could retire, "[w]hatever the retirement age is". *Id.* Our court stated: "even if the district court believed [plaintiff] wanted to work until age 67, *wanting* to work until age 67 is not the only or even the most significant factor in determining whether someone actually *will* work until age 67". *Id.* (emphasis in original). Citing *Madore*, our court held this vague testimony was insufficient to support an above-average work-life expectancy. *Id.* at 475–76.

Here, the court's use of age 75 to calculate damages was not clearly erroneous. DePerrodil fully developed the evidentiary basis for such a departure from the BLS average. Unlike in *Madore*, dePerrodil presented an expert (vocational-rehabilitation counselor) and the medical history upon which the expert based her opinion. As was the case in *Barto*, dePerrodil's stated retirement goal was a critical piece of information. Unlike *Barto*, however, dePerrodil's goal was specific and corroborated by an agreement with

13

his wife to work until age 75. Furthermore, the vocational counselor agreed it was a "very reasonable" goal, considering his medical history, work history, and future medical prognosis. Neither of the plaintiffs in *Madore* or *Barto* presented a vocational expert to justify a departure from the BLS statistics. For these reasons, it was not clear error for the court to credit the vocational counselor's expert testimony and award lost-wage damages until age 75.

### III.

For the foregoing reasons, the judgment is AFFIRMED, except for the award of medical expenses; that award is VACATED. This matter is REMANDED for entry of an amended judgment consistent with this opinion.