# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 31, 2025

Lyle W. Cayce
Clerk

No. 24-30464

Gulf Island Shipyards, L.L.C.,

*Plaintiff—Appellant*,

*versus*

LaShip, L.L.C., in personam; Reel Pipe, L.L.C., in personam; Betty Chouest M/V, *bearing Official No. 1193951, her engines, tackle, furniture, apparel, appurtenances, etc., in rem*,

*Defendants—Appellees*.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:22-CV-154

_____

Before Stewart, Dennis, and Haynes, *Circuit Judges*.

Per Curiam:[*]

This case concerns ships that were damaged after some became unmoored in a canal during Hurricane Ida. The parties accuse each other of deficiencies in mooring their ships in preparation for the storm. After a bench trial, the district court apportioned 65 percent of the fault to Plaintiff Gulf Island and 35 percent of the fault to Defendant LaShip after evaluating the

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

number and severity of the parties' respective mooring deficiencies. It then applied those percentages to the damages stemming from repair costs to the *Betty Chouest*, a vessel owned by Defendant Reel Pipe and stationed at LaShip's dock, and the *Wild Horse*, one of Gulf Island's vessels. It awarded no damages for repair costs to two of Gulf Island's other vessels, the *Salvo* and the *War Horse*. Gulf Island raises several challenges to the district court's findings of fact and conclusions of law. We REVERSE the denial of liability for damages to the *Salvo* and REMAND to decide the damages. We AFFIRM the rest of the district court's judgment.

## I.    Background

In August 2021, Hurricane Ida struck the Houma Navigation Canal, where Gulf Island and LaShip each had facilities. At its peak, Hurricane Ida was a category four hurricane with sustained winds of 150 miles per hour and gusts as high as 172 miles per hour. Vessels moored at Gulf Island's and LaShip's facilities contacted each other during the storm.

Gulf Island is a shipyard that specializes in the design, construction, and repair of marine vessels. At the time of the hurricane, Gulf Island was the custodian of two multipurpose service vessels, the *Wild Horse* and the *War Horse*, which were still under construction and lacked any means of propulsion. Both vessels were moored on the west side of the canal at a dock owned by Bollinger Houma Shipyards, LLC. Gulf Island had another vessel, the *Salvo*, moored in a slip south of the Bollinger dock.

Because Gulf Island does not regularly moor vessels, it hired a third party to formulate a mooring plan. Pursuant to that mooring plan, Gulf Island secured the *Wild Horse* and the *War Horse* to unburied, 25-ton concrete

blocks in the Bollinger dock yard adjacent to the dock. Additionally, the ships were tied to stationary bollards.[1]

Slightly further north in the canal, 14 ships were moored along LaShip's dock. Most of the ships were moored in groups of three. According to LaShip, in the second set of three (counting from north to south), the *Betty Chouest* was the middle ship. The ships closest to the shore were secured to mooring structures consisting of 24-inch diameter pipe extending six feet above ground with a crossbar approximately four feet above ground. The ships in each set of three were moored to each other with four synthetic ropes. The northernmost row of ships had a slight weakness relative to the others because those ships did not have any moorings beyond their bows, making them vulnerable to wind from the north. Separately, the *Eland* was dry docked just below those fourteen ships and had a crew inside for the duration of the storm.

The parties dispute what happened during the storm, but below are two satellite images showing where the relevant ships were right before the storm and where they came to rest after the storm.[2]

---

[1] A bollard is a short, thick post on the deck of a ship or on a wharf, to which a ship's rope may be secured.

[2] In the "before" shot, the *Salvo* is not pictured in the slip where it is shown still moored in the "after" shot. But neither party disputes that it was moored in that slip before the storm.

No. 24-30464

Before:



After:



Gulf Island sued LaShip and Reel Pipe for negligence and sought damages. Gulf Island, alleging that defendants were negligent in their mooring and storm preparations, sought to recover for damages to the *War Horse*, *Wild Horse*, *Salvo*, and the Bollinger dock. Gulf Island alleged that the *Betty Chouest* hit the *Wild Horse* while the *Wild Horse* was still stationary and caused it to become unmoored. It also alleged that the *Betty Chouest* hit the *Salvo* while stationary and that one of the LaShip vessels caused damage to the *War Horse*. Reel Pipe counterclaimed and sought to recover for damages to the *Betty Chouest*. It alleged that the *Wild Horse* became unmoored and then hit the *Betty Chouest*.

After a bench trial, the district court issued its findings of fact and conclusions of law. The district court found that around 1:45 p.m. the vessels at LaShip's dock began breaking loose. At that time, winds were blowing from the north at around 40 miles per hour, with gusts up to 70 miles per hour. The northernmost vessels at LaShip broke loose first and cascaded down, eventually causing the others to come loose too. The ships, including the *Betty Chouest*, floated south, but officers who were aboard the *Eland* at the time testified that none of the LaShip vessels contacted the *War Horse* or the *Wild Horse* while those two ships were moored at the Bollinger dock. The master of the *Eland*, Dalton Cooper, testified that the farthest drifting LaShip vessel reached only halfway across the canal as it floated south.

Cooper also testified that around 3:10 p.m., when the wind shifted and began blowing from the northwest, the *Wild Horse* broke free of its moorings, and the *War Horse* broke partially free. The district court found that the *Wild Horse* and the *Betty Chouest* each floated down the canal into a slip south of their respective docks. At some point along the way, or perhaps in the slip, the two ships made contact.

The district court also found that the *Salvo*, which never became unmoored, sustained damage including orange paint transfer from the *Betty Chouest*, but that the damage was not indicative of large force. The other 13 LaShip vessels that broke free were recovered several miles downstream after the storm.

The district court concluded that both Gulf Island and LaShip were negligent. It apportioned 65 percent of the fault to Gulf Island and 35 percent of the fault to LaShip. It determined that Gulf Island bears the majority of fault due to the number and nature of its mooring deficiencies. In particular, the district court cited Gulf Island's "use of mixed lines and their level of slack and overlay with one another, that at least one line was roped around a handrail in order to attach to a bitt on the ship, and the use of unburied concrete blocks." Regarding LaShip's fault, the district court found that it "could have rearranged its vessels such that a tier of vessels did not extend beyond the northernmost shoreside mooring structure."

Turning to damages, the district court concluded that Gulf Island had demonstrated damages to the *Wild Horse* and the *Salvo*[3] in the amount of $503,130.51. Applying LaShip's proportionate fault of 35 percent to that amount, the district court determined that LaShip owed Gulf Island $176,095.68. It also held that Reel Pipe demonstrated damages to the *Betty Chouest* in the amount of $860,201. Applying Gulf Island's proportionate fault of 65 percent to that number, the district court concluded that Gulf Island owed Reel Pipe $559,130.65.

Gulf Island timely appealed.

_____

[3] As discussed below, the district court's inclusion of the *Salvo* here was likely a clerical error.

No. 24-30464

## II.    Jurisdiction & Standard of Review

The district court had admiralty jurisdiction over this case pursuant to 28 U.S.C. § 1333, and we have jurisdiction over the final judgment pursuant to 28 U.S.C. § 1291.

On appeal from a bench trial, we review factual findings for clear error and legal conclusions de novo. *Barto v. Shore Constr., LLC*, 801 F.3d 465, 471 (5th Cir. 2015). "[F]indings of fact include determinations of negligence, apportionment of fault, and calculation of damages." *Luwisch v. Am. Marine Corp.*, 956 F.3d 320, 326 (5th Cir. 2020) (per curiam). We can overturn the district court's factual findings only if we are "left with the definite and firm conviction that a mistake has been made." *DePerrodil v. Bozovic Marine, Inc.*, 842 F.3d 352, 356 (5th Cir. 2016) (quotation omitted). "[T]he clearly erroneous standard of review following a bench trial requires even greater deference to the trial court's findings when they are based on determinations of credibility." *Luwisch*, 956 F.3d at 326 (quotation omitted). In such scenarios, there is "a strong presumption that the court's findings must be sustained even though this court might have weighed the evidence differently." *Id.* (quotation omitted).

## III.    Discussion

Gulf Island raises various challenges to the district court's findings of fact and conclusions of law. We address each in turn.

### A. The Act of God Defense

We start with the Act of God defense, which Gulf Island invoked in light of Hurricane Ida. A party invoking the Act of God defense can avoid liability if it shows "that the accident could not have been prevented by human skill and precaution and a proper display of nautical skills." *James v.*

*River Parishes Co.*, 686 F.2d 1129, 1132 (5th Cir. 1982) (internal quotation marks and citation omitted).

The district court correctly explained the Act of God defense and noted that the existence of a hurricane does not alone mean the defense applies, but it did not expressly reject that defense in its conclusions of law. The district court did, however, conclude that Gulf Island was negligent based on evidence demonstrating several critical deficiencies in Gulf Island's mooring arrangement and storm preparations. It also held that those deficiencies were the proximate cause of the *Wild Horse*'s breakaway and subsequent collision. Accordingly, the district court's findings of fact and conclusions of law implicitly deny Gulf Island's Act of God defense.

Without any caselaw supporting the notion that a district court errs as a matter of law by not explicitly (though implicitly through the ultimate decision) denying the defense, Gulf Island's position amounts to a disagreement with the district court's factual finding regarding Gulf Island's mooring deficiencies. Because Gulf Island fails to prove to us that the district court clearly erred in making that finding, we must affirm the denial of Gulf Island's Act of God defense. *DePerrodil*, 842 F.3d at 356 (explaining that a factual finding is clearly erroneous if we are "left with the definite and firm conviction that a mistake has been made").

## B. The Maritime Presumptions

Next, Gulf Island argues that the district court improperly circumvented the *Louisiana* Rule and the *Pennsylvania* Rule.

The *Louisiana* Rule derives from *The Louisiana*, 70 U.S. (3 Wall.) 164 (1865), and creates a presumption of fault for a vessel that drifts into a stationary object. *Combo Marine, Inc. v. U.S. United Bulk Terminal, LLC*, 615 F.3d 599, 604 (5th Cir. 2010). To rebut the presumption, the drifting

vessel bears the burden of production and persuasion on the issue of fault. *Id.* at 605.[4]

The *Pennsylvania* Rule, which comes from *The Pennsylvania*, 86 U.S. (19 Wall.) 125 (1873), holds that "a vessel in derogation of a statutory rule bears the burden of demonstrating that its fault could not have been the cause in fact of the casualty." *Teco Barge Line, Inc. v. Exmar Lux* (*In re Mid-South Towing Co.*), 418 F.3d 526, 533 (5th Cir. 2005).

"Once evidence is presented, presumptions become superfluous because the parties have introduced evidence to dispel the mysteries that gave rise to the presumptions." *Combo Marine, Inc.*, 615 F.3d at 605 (citation modified); *see also id.* at 607 ("[W]ith the presence of evidence of fault in the record, the need for presumptions evaporates."); *see also Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 n.3 (5th Cir. 1977) ("[W]e reject the holding of the Third Circuit that when both sides had fully presented testimony regarding their version as to what happened prior to the collision . . . the presumption disappeared *as a matter of law*." (emphasis added) (internal quotation marks and citation omitted)).[5]

Here, the district court held that the presumptions were superfluous because both parties had introduced extensive evidence and therefore filled the factual vacuum the presumptions are designed to fill. We conclude that holding was not in error. The district court heard eyewitness testimony from

---

[4] To rebut the presumption, a party "can demonstrate (1) that the allision was the fault of the stationary object; (2) that the moving vessel acted with reasonable care; or (3) that the allision was an unavoidable accident." *Combo Marine, Inc.*, 615 F.3d at 605 (quotation omitted).

[5] We conclude there is no conflict between *Combo Marine* and *Bunge*. The latter says that a district court is not *prohibited as a matter of law* from employing a maritime presumption even when the parties present evidence. The former says it is not *required* when the evidence is adequate.

the *Eland* crew that LaShip's vessels did not drift into the *Wild Horse* or the *War Horse* while those vessels were stationary at the Gulf Island dock. LaShip's expert also presented a diagram demonstrating the physical impossibility of the *Betty Chouest* contacting the *Wild Horse* while the *Wild Horse* was stationary, based on the location of the damage to both vessels. It was therefore not operating in a "factual vacuum" as to the relevant vessels. *Combo Marine, Inc.*, 615 F.3d at 605 (quotation omitted).

That said, as discussed further below in § III.G, it is unclear why the district court did not apply any presumptions to the *Salvo*, which remained fully stationary throughout the storm and lacked an eyewitness account of its damage. As we explain later, we reverse and remand that portion of the judgment, but we uphold the rest of the decision.

## C. Assignment of Fault

Gulf Island also argues that the district court clearly erred by assigning it 65 percent of the fault, as opposed to 50 percent.

In *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411 (1975), the Supreme Court overturned a century-old admiralty rule that required an equal assignment of fault whenever both parties were found liable, regardless of their relative degree of fault. It said that an equal apportionment of fault is reasonable "only where each vessel's fault is approximately equal and each vessel thus assumes a share of the collision damages in proportion to its share of the blame, or where proportionate degrees of fault cannot be measured and determined on a rational basis." *Id.* at 405. Accordingly, courts now determine fault "based upon the number and quality of faults by each party" and "the role each fault had in causing the collision." *Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360, 370 (5th Cir. 2006).

Gulf Island raises a number of arguments about why it would have apportioned fault differently. It argues that LaShip should bear more

responsibility because, unlike Gulf Island, LaShip regularly moors vessels; LaShip's vessels broke free under less severe wind than the Gulf Island vessels; and Gulf Island hired a third party to formulate a mooring plan and complied with it.  But it is not enough that someone (including us) "might have weighed the evidence differently" than the district judge, and nothing Gulf Island says creates a "definite and firm conviction that a mistake has been committed."   *Luwisch*, 956 F.3d at 326 (quotation omitted).  Accordingly, we affirm the district court's apportionment of fault.

## D.  Value of Damages to the *Betty Chouest*

Next, Gulf Island contends that the district court clearly erred by finding $860,201 in damages to the *Betty Chouest*, the full value of its repairs.  It points primarily to testimony by defendants' expert on cross examination, during which the expert acknowledged a possibility of some damages being caused by other factors.  Defendants respond that the *possibility* of some damages being caused by other factors is not at odds with the preponderance-of-the-evidence standard and points out that the same expert testified on direct that it was more probable than not that the *Betty Chouest* sustained $860,000 in damages as a result of its impacts with the *Wild Horse*.

Ultimately, the district court's decision to accept the opinion of defendants' expert on direct examination is a classic example of a credibility determination, which requires great deference.  *See Luwisch*, 956 F.3d at 326.  As defendants point out, the expert's candid answers on cross examination may have bolstered his credibility with the district court rather than undercut his opinion.  Accordingly, we affirm the district court's finding on the value of damages to the *Betty Chouest*.

## E.  Value of Damages to the *Wild Horse*

Similarly, Gulf Island asserts that the district court should have found $804,420, instead of $503,130.51, in damages to the *Wild Horse*.

11

Gulf Island initially alleged that the damage to the *Wild Horse* amounted to $899,547.79. But the district court found that Gulf Island failed to meet its burden on the claimed total. First, evidence showed that $95,127.79 of the claimed total was for replacing pumps that were damaged by significant water intrusion before the storm. Next, the district court noted that between January and July 2023, the estimate for the *Wild Horse*'s hull steel repairs jumped from $503,130.51 to $804,420.00. The district court chose to credit the first number because "no credible explanation was given to explain these increased costs and no associated increase was included on the *War Horse*'s estimated repairs for similar line items" (italics added).

According to Gulf Island, the difference between the two numbers is that the first number is a *preliminary estimate* after surveying the damage in 2021, while the second number is an *actual estimate* after receiving quotes for the repairs in July 2023. But this argument does not sufficiently explain the difference between the estimates. The first estimate is dated January 18, 2023, and says that "costs are based on estimates and quotations obtained at current prices of the damages identified." If material prices had caused the estimate to almost double in a period of six months, that would have been easy enough for Gulf Island to demonstrate at trial. But it made no such attempt. Additionally, comparing the two estimates reveals no material difference between the damages identified in each. We therefore conclude that the district court did not clearly err in its damages finding for the *Wild Horse*.

## F. No Damages Award for the *War Horse*

The district court did not award damages for the *War Horse*, the vessel that remained partially moored to Gulf Island's dock after the storm. It based its decision on the *Eland* crewmembers' eyewitness testimony that none of LaShip's vessels made contact with the *War Horse*. It also seems to have

found that Gulf Island's own mooring deficiencies caused the damage to the Bollinger bulkhead and to the *War Horse*.

Gulf Island challenges that ruling, pointing to photographic evidence of damage to the *War Horse*'s starboard side. It also cites undisputed testimony that the only other vessels that broke away in the area were from the LaShip facility.

LaShip responds by highlighting testimony from its expert that the damage to the *War Horse* did not include orange paint transfer that would be indicative of contact with the *Betty Chouest*. It also argues that Gulf Island has yet to identify another LaShip vessel responsible for the contact.

We are unable to conclude that the district court clearly erred by not awarding damages for the *War Horse*. The district court heard eyewitness testimony that none of LaShip's vessels made contact with the *War Horse*, and LaShip's expert testified that the *War Horse* did not have orange paint transfer that would indicate damage caused by the *Betty Chouest*. Given the highly deferential standard of review applied to credibility determinations during a bench trial, we affirm the district court's decision as to the *War Horse*. *Luwisch*, 956 F.3d at 326 ("[T]he clearly erroneous standard of review following a bench trial requires even greater deference to the trial court's findings when they are based on determinations of credibility." (internal quotation marks and citation omitted)).

## G. No Damages Award for the *Salvo*

The district court did not award any damages for the *Salvo*, the Gulf-Island-owned vessel that was moored in the same slip in which the *Betty Chouest* and the *Wild Horse* came to rest. It explained that "[w]hile there is some evidence to show contact between the *Betty Chouest* and the *Salvo*, specifically orange paint transfer on the *Salvo*, which presumably came from *Betty Chouest*, the evidence suggests that this damage was 'fairly minor' and

'not indicative of a large force'" (italics added).  The district court therefore concluded that it could not find by a preponderance of the evidence that LaShip was liable for such damage.[6]

We reverse this conclusion because it is clear that the *Betty Chouest* impacted the *Salvo*.  First, the district court heard undisputed testimony that the *Salvo* remained moored throughout the storm.  So, as alluded to earlier, it is clear that the *Louisiana* Rule and the *Pennsylvania* Rule would have applied in this situation (not the others), especially given the lack of eyewitness testimony as to what caused the *Salvo*'s damage.  Second, LaShip's own expert testified that he did not "know of any other vessels, orange Chouest vessels, that entered the slip" and that it would be "reasonable to presume that the *Betty Chouest* was against the *Salvo* or made contact with the *Salvo*," based on the orange paint transfer.  Accordingly, we reverse the district court's conclusion on this.  The district court's reasoning seemed to hinge on the fact that the damage was fairly minor.  But that does not explain why LaShip should avoid liability for those damages, minor or not.  In any event, Gulf Island seeks damages of $100,000 to fix the *Salvo*, which is "minor" compared to the other ships but not "nothing."  So, we therefore remand the issue of damages to the district court to determine the amount and award it to Gulf Island for the *Salvo*.

---

[6] Confusingly, however, the district court later summarized its holding by saying that "Gulf Island has shown that it is entitled to damages in the amount of $503,130.51, representing reasonable and necessary repairs to the *Wild Horse* and *Salvo* following the *Wild Horse*'s collision with the *Betty Chouest*" (italics added).  Because this conflicts with the district court's findings on the *Salvo*, and because earlier the district court said that $503,130.51 represents the amount of damage to the *Wild Horse* alone, we conclude that this was written erroneously.  It does, however, seem to show that the district court knew that the *Salvo* had damages, which we are remanding on.

No. 24-30464

## IV.    Conclusion

In sum, we REVERSE the issue of liability for damages to the *Salvo* and REMAND to decide and award the damages for that.  We AFFIRM the rest of the district court's judgment.