# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 11, 2020

Lyle W. Cayce
Clerk

No. 19-30311

Deloach Marine Services, L.L.C.,

*Plaintiff—Appellee/Cross-Appellant*,

*versus*

Marquette Transportation Company, L.L.C., *in personam*,

*Defendant—Appellant/Cross-Appellee*.

Appeals from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:17-CV-2970

Before Smith, Willett, and Duncan, *Circuit Judges*.
Stuart Kyle Duncan, *Circuit Judge*:

Two barge towboats collided on the Mississippi River. After a bench trial, the district court found the captains of both vessels negligent to varying degrees. Both parties appeal. Finding no clear error, we affirm the district court's apportionment of fault. We remand to consider prejudgment interest.

## I.

### A.

On January 26, 2016, the M/V JUSTIN PAUL ECKSTEIN ("JUSTIN") and M/V VANPORT ("VANPORT") collided near mile

No. 19-30311

marker 131 on the Mississippi River. Both vessels are barge towboats, and each had several barges attached to it. Before the collision, the JUSTIN sat idle on the west bank of the river, south of a barge-storage area called a fleeting facility. The JUSTIN was facing north ("upriver") and needed to enter the channel to move south ("downriver"). In order to turn around, the JUSTIN's captain, Billy Jackson, hoped to "top around" the JUSTIN, a maneuver through which her bow (or, more precisely, the bows of her barges) would be extended out of the river's "slack" water and into its navigational channel, where the current would turn her bow to face south. At 12:49 pm, Jackson made a radio call to announce to vessels in the area that he intended to top around into the channel.

Ten minutes before Jackson's call, the VANPORT was a few miles upstream of the JUSTIN, traveling downriver. The VANPORT had made a "passing agreement" with a larger ship, the BEATRICE, whereby the BEATRICE would pass the VANPORT to the VANPORT's port (left). In reaching this agreement, the BEATRICE asked the VANPORT to stay as far to the right (*i.e.*, as close to the west bank) as she could, because the BEATRICE—an oceangoing vessel with a deep hull—needed to stay in the deepest part of the river channel. The VANPORT's captain, Matthew Vidrine, put the vessel in idle and moved out of the navigational channel. The BEATRICE began to overtake the VANPORT as agreed.

At 12:54 pm, as the BEATRICE was overtaking the VANPORT, Jackson called the VANPORT. The following exchange took place:

> JUSTIN: I straightened her up there with all the traffic coming. I think you're down far enough now that I can go ahead and start letting her spin.
>
> VANPORT: Yeah, you sure can. I'm just slowed down to get this ship by me . . . .
>
> JUSTIN: Yeah, seeing as how I'm going to be about abreast here

and I got her crossways, I didn't want to have my head stuck out there in nobody's way.

VANPORT: I appreciate it. I saw that, but I had confidence.

The two captains interpreted this exchange differently. Vidrine thought the JUSTIN planned to execute the top-around maneuver *after* the VANPORT passed by. Vidrine therefore believed the JUSTIN would remain outside the navigational channel until the VANPORT passed. When Vidrine agreed to allow the JUSTIN to "start letting her spin," he thought Jackson planned to "spin in behind the VANPORT and fall in behind it." For his part, however, Jackson believed Vidrine had agreed to keep the VANPORT clear of the JUSTIN while she topped around *ahead* of the VANPORT. Jackson also believed he had enough time to execute the maneuver before the VANPORT passed, in part because Vidrine told him he had "slowed down." Jackson therefore began to top around immediately after the radio exchange, pushing the JUSTIN's bow into the navigational channel.

Computerized navigational data (called "Rose Point data"[1]) shows that immediately after the captains' radio exchange, the VANPORT continued on a straight course, on the edge of the navigational channel, "hugging" the fleeting facility along the west bank. Just as the JUSTIN began pulling out from the bank to top around, the BEATRICE reached the VANPORT's port and began its passing maneuver. At 12:58 pm, the BEATRICE cleared the VANPORT, and Vidrine realized the JUSTIN was turning directly into the VANPORT's path. As the VANPORT immediately

---

[1] According to the district court, "Rose Point is a marine navigation software program that allows vessel captains to see their vessel's trajectory as well as the position of other vessels near them." Courts have recognized Rose Point as "the industry standard," which "automatically and objectively record[s] vessel location and movement on a proven industry standard electronic chart." *Marquette Transp. Co., LLC v. M/V Century Dream*, No. CV 16-522, 2017 WL 677814, at *2 (E.D. La. Feb. 21, 2017).

turned to port to avoid the JUSTIN, Vidrine radioed the JUSTIN, "I hope you're backing down," to which Jackson responded, "Roger, roger, I'm backing away from you."

Too late. Not a minute after, the barges the JUSTIN was towing struck the VANPORT's lead barge. After the collision, Jackson told Vidrine: "[T]hat's why I asked you whether you thought it would be all right for me to go ahead and start turning . . . . I ain't but six foot off the bank." The collision caused about $1.2 million in damage to the VANPORT's cargo. Insurers of the VANPORT reimbursed the cargo owner for the full amount, and Deloach, the VANPORT's owner, took an assignment of any claim against the JUSTIN's owner, Marquette.

Litigation ensued.

## B.

Deloach first sued Marquette, alleging Jackson's negligence caused the collision. Marquette counterclaimed, alleging Vidrine was contributorily negligent. The district court held a two-day bench trial, hearing testimony from both captains as well as two expert witnesses. The court found both captains at fault, apportioning 70% to Jackson and 30% to Vidrine. Its findings were based on ordinary negligence, the *Pennsylvania* Rule,[2] and negligence by violating an industry custom.

As to ordinary negligence, the court "determine[d] that both captains failed to adhere to a standard of reasonable care under the circumstances, but that defendant [the JUSTIN] was more at fault than plaintiff [the

---

[2] Under the so-called *Pennsylvania* Rule, a ship that violates a statute designed to prevent collisions is liable unless it can prove its violation "could not have been a cause of the collision." *Pennzoil Producing Co. v. Offshore Exp., Inc.*, 943 F.2d 1465, 1472 (5th Cir. 1991) (citing inter alia *The Pennsylvania*, 86 U.S. 125, 136 (1873)).

No. 19-30311

VANPORT].” This was primarily because “the JUSTIN’s decision to perform the top around maneuver in front of oncoming traffic created the unsafe circumstances that led to the collision.” As the downriver vessel, the VANPORT had the right of way, and Jackson knew the BEATRICE was passing the VANPORT. Therefore, “the JUSTIN should have waited until the channel was clear before topping around.” The JUSTIN was also negligent “in failing to clearly communicate its intent to turn in front of, rather than behind or to the side of, the VANPORT.” Jackson’s ambiguous communications “did not adequately convey [his] intent to reverse the typical right-of-way pattern.”

On the other hand, the district court found the VANPORT negligent in agreeing “that the JUSTIN could begin the top around maneuver before the VANPORT had safely passed the JUSTIN.” Vidrine should have realized from Rose Point data that “it was too early for the JUSTIN to begin its turn.” Accordingly, the VANPORT should have instructed the JUSTIN to wait to begin its turn until the VANPORT was clear.

The court also concluded both captains violated several of the Inland Navigational Rules and that their violations caused the collision. *See generally Marine Transp. Lines, Inc. v. M/V Tako Invader*, 37 F.3d 1138, 1144 (5th Cir. 1994) (discussing enactment of Inland Navigational Rules in 1980 “to unify the rules governing navigation in the inland waters of the United States”). According to the court, both captains violated Rule 2, which obliges captains to keep “the ordinary practice of seamen,” 33 C.F.R. § 83.02, for the same reasons that both were negligent.[3] The court next found the JUSTIN violated

---

[3] Rule 2 (*see* 33 C.F.R. § 83.02(a)) relevantly provides:

(a) Nothing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences of any neglect to comply with these Rules or of the

No. 19-30311

Rule 14(d), which gives downbound vessels the right-of-way over upbound vessels when two vessels are proceeding head-on. *Id.* § 83.14.[4] The VANPORT had right-of-way as the downriver vessel, and the JUSTIN violated Rule 14(d) "when it performed the top around maneuver in front of the VANPORT." The district court rejected Marquette's argument that the VANPORT violated Rule 14(d) by failing to "propose the manner of passage" as the rule requires. *Id.* The VANPORT had no notice "that the JUSTIN was planning to move in front of it," and "it was reasonable for the VANPORT to understand that the JUSTIN would turn behind it."

Finally, the district court also found that "neither captain violated Rule 5," which requires captains to maintain a "proper look-out," *id.* § 83.05;[5] that the VANPORT did not violate Rule 6, which requires vessels to "proceed at a safe speed," *id.* § 83.06;[6] and that "both captains violated

---

neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

[4] Rule 14(d) (*see* 33 C.F.R. § 83.14(d)) provides:

(d) Notwithstanding paragraph (a) of this Rule, a power-driven vessel operating on the Great Lakes, Western Rivers, or waters specified by the Secretary, and proceeding downbound with a following current shall have the right-of-way over an upbound vessel, shall propose the manner of passage, and shall initiate the maneuvering signals prescribed by Rule 34(a)(i) (§ 83.34(a)(i)), as appropriate.

[5] Rule 5 (*see* 33 C.F.R. § 83.05) provides:

Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.

[6] Rule 6 (*see* 33 C.F.R. § 83.06) relevantly provides:

Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions.

*See also id.* § 83.06(a), (b) (enumerating various factors for "determining a safe speed").

6

Rules 7 and 8," which require captains to use "all available means" to assess risk of collision, *id.* § 83.07(a),[7] and to take appropriate action to avoid collision, *id.* § 83.08.[8] But the court's findings regarding these rules "[did] not change the Court's conclusions about the nature of the parties' negligence."[9]

The district court allocated 70% of the liability for the collision to Marquette as owner of the JUSTIN and the remaining 30% to Deloach as owner of the VANPORT, finding that the JUSTIN played a larger role in the collision by "mov[ing] into the channel in front of downstream traffic without taking due care." The VANPORT shared fault because it gave "the JUSTIN permission to begin topping around."

Both parties timely appeal, contesting the district court's allocation of fault. Marquette's argument hinges principally on its contention that, contrary to the district court's ruling, Rule 14(d) required the VANPORT to propose the manner of passage and that the VANPORT's failure to do so led to the collision. Marquette further argues that the district court's

---

[7] Rule 7 (*see* 33 C.F.R. § 83.07(a)) relevantly provides:

(a) Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist.

[8] Rule 8 (*see* 33 C.F.R. § 83.08(a)) relevantly provides:

(a) Any action taken to avoid collision shall be taken in accordance with the Rules of this subpart (Rules 4–19) (§§ 83.04 through 83.19) and shall, if the circumstances of the case admit, be positive, made in ample time and with due regard to the observance of good seamanship.

*See also id.* § 83.08(b)–(f) (specifying avoidance measures in specific circumstances).

[9] The district court also rejected Marquette's argument that pursuant to industry custom, the vessels had "established a top around agreement" and that the VANPORT violated that agreement. Marquette does not contest this conclusion.

misinterpretation of Rule 14(d) led to errors in its holdings regarding Rules 5, 6, 7, and 8. Deloach claims the district court erred in apportioning 30% liability to the VANPORT and in omitting prejudgment interest from Deloach's damage award.

## II.

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed *de novo*." *Luwisch v. Am. Marine Corp.*, 956 F.3d 320, 326 (5th Cir. 2020) (quoting *Barto v. Shore Constr., LLC*, 801 F.3d 465, 471 (5th Cir. 2015)). "[W]e will upset the district court's findings of fact only if we are 'left with the definite and firm conviction that a mistake has been committed.'" *Id.* (citation omitted). "[F]indings of fact include determinations of negligence, apportionment of fault, and calculation of damages." *Id.* (citing *DePerrodil v. Bozovic Marine, Inc.*, 842 F.3d 352, 356, 358, 361 (5th Cir. 2016)). We grant "even 'greater deference to the trial court's findings when they are based on determinations of credibility.'" *Id.* (quoting *Guzman v. Hacienda Records & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015)). And we employ "a strong presumption that the court's findings must be sustained even though this court might have weighed the evidence differently." *Id.* (quoting *Johnson v. Cenac Towing, Inc.*, 544 F.3d 296, 303 (5th Cir. 2008)).

## III.

### A.

We first address Marquette's argument that the district court misinterpreted Rule 14(d) when it held that the VANPORT was under no duty to "propose the manner of passage." We disagree.

The Inland Navigational Rules contain eight rules governing vessels' rights-of-way. *See* 33 C.F.R. §§ 83.11–83.18. Rule 14, which the parties agree

applies to the collision, covers "[h]ead-on situation[s]." *Id.* § 83.14. It provides in relevant part:

> [A] power-driven vessel operating on the Great Lakes, Western Rivers, or waters specified by the Secretary, and proceeding downbound with a following current shall have the right-of-way over an upbound vessel, shall propose the manner of passage, and shall initiate . . . maneuvering signals . . . as appropriate.

*Id.* § 83.14(d).

Marquette argues that the district court ignored Rule 14(d)'s requirement that the downriver vessel "propose the manner of passage" and initiate appropriate maneuvering signals. According to Marquette, "the VANPORT . . . instructed the JUSTIN she could begin her downriver turn." Marquette argues the district court "defiantly . . . ignored the overarching purpose of Rule 14"—namely, that the downbound vessel "with the right of way, must use its right of way appropriately and communicate with the JUSTIN." It claims "[t]hat 'right of way' does not mean that the JUSTIN must 'yield,' only that the right of way vessel like VANPORT gets to dictate how the two vessels meet." According to Marquette, the district court erred in finding the VANPORT lacked notice of the situation to trigger its obligation to propose passage, as the VANPORT "knew that she was heading downriver in the direction of the JUSTIN."

We disagree for two reasons. First, while Marquette paints its appeal as a *de novo* attack on the district court's legal reasoning, its Rule 14(d) argument turns on whether the court was correct that the VANPORT lacked notice that the two vessels were on a collision course. That is a fact finding we review only for clear error. *See Luwisch*, 956 F.3d at 326. Marquette insists that Vidrine knew the VANPORT was heading towards the JUSTIN and that the district court's ruling therefore "sidestep[ped] the VANPORT's

obligation to propose a safe manner of passage." But this argument contradicts the district court's findings that the VANPORT lacked notice "that the JUSTIN was planning to move in front of it" and that "it was reasonable for the VANPORT to understand that the JUSTIN would turn behind it." If Marquette wishes to challenge those findings, it must show they were not only incorrect but clearly erroneous. Marquette does not try to meet this standard, and our review of the record detects no clear error.

Second, even applying *de novo* review, we reject Marquette's interpretation of Rule 14(d). At the outset, we disagree with Marquette's unfounded claim that the VANPORT's right-of-way "does not mean that the JUSTIN must 'yield.'" The term "right-of-way" means precisely that: it is "[t]he right to take precedence in traffic." *Right-of-way*, BLACK'S LAW DICTIONARY (11th ed. 2019). As the district court noted, we have previously recognized the "failure to yield the right-of-way" as an act of negligence. *Union Oil Co. of Cal. v. Tug Mary Malloy*, 414 F.2d 669, 673 (5th Cir. 1969). Marquette tries to distinguish *Mary Malloy* merely because it was not a head-on case involving Rule 14(d), but instead involved a collision between two ships traveling in the same direction. *See id.* at 671. That is immaterial. The decision is still premised on the commonsense notion that the corollary of one vessel's right-of-way is the other's duty to yield.[10] Here, the district court found that the upbound JUSTIN's failure to yield to the downbound VANPORT violated the VANPORT's right-of-way. And, as

---

[10] *See, e.g.*, *id.* at 672 (stating the "primary issue" was whether the record "sustain[ed] the trial court's finding that the MARY MAL[L]OY's *failure to yield the right-of-way* to the PURE OIL was the proximate cause of the collision" (emphasis added)); *id.* at 672 n.3 (rejecting appellant's "halfhearted[]" attack on district court's negligence finding based on the argument that "the MARY MALLOY was under no duty to *yield the right-of-way* to the PURE OIL" (emphasis added)).

No. 19-30311

explained, Marquette has failed to show any clear error in the district court's findings concerning the circumstances of the collision.

We similarly reject Marquette's reading of Rule 14(d) to impose a "mandatory duty to propose safe passage," notwithstanding the VANPORT's lack of notice of the JUSTIN's planned maneuver. To begin with, Marquette misreads Rule 14(d)'s text, which states that the downbound vessel "shall propose the manner of passage," but only "as appropriate." 33 C.F.R. § 83.14(d).[11] Marquette also cites *Marine Transport Lines, Inc., v. M/V Tako Invader*, 37 F.3d at 1145, but that decision does not help its argument. There, we held that a downbound vessel "may force a departure from" the usual rule that head-on vessels pass on their port sides, *see* 33 C.F.R. § 83.14(a), "provided" the downbound vessel "propose[s] the manner of passage" in compliance with Rule 14(d). *Marine Transport Lines* does not hold or even suggest that a downbound vessel has an affirmative duty, notwithstanding its right-of-way, to propose the manner of passage. Rather, it treats the "manner of passage" language in Rule 14(d) as a means for the downbound vessel to bypass the ordinary port-to-port passage standard in Rule 14(a). *See id.*[12] Neither party argues that such a situation was presented here. *Marine Transport Lines* is therefore irrelevant.

---

[11] Under the series-qualifier canon, "as appropriate" modifies the "shall propose" obligation, because the phrase is separated by a comma from a list of three parallel "shall" verbs. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 147–51 (2012).

[12] Moreover, *Marine Transport Lines* also involved the "Narrow Channel Rule" in Rule 9. *Id.* at 1142–44; *see* 33 C.F.R. § 83.09. That rule for "[a] vessel proceeding along the course of a narrow channel or fairway," *id.* § 83.09(a)(i), has no application to this case.

**B.**

Marquette next argues that the district court misinterpreted Rules 5, 6, 7, and 8. It contends the district court's misreading of Rule 14(d) and its holding that the VANPORT had the right-of-way infected its analyses under these other rules.

We reject this argument for three reasons. First, as discussed above, Marquette has not shown the district court misinterpreted Rule 14(d) or that the VANPORT's right-of-way was ineffective. Because its arguments regarding Rules 5 through 8 flow from the district court's putative misreading of Rule 14(d), we reject these arguments too. Second, the district court's holdings regarding Rules 5 through 8 were made alternatively to its determinations on ordinary negligence. The court found "that these rules [did] not change [its] conclusions about the nature of the parties' negligence." Marquette acknowledges this but fails to develop any argument that the district court erred in its findings regarding ordinary negligence. Accordingly, even if we agreed with Marquette's positions regarding these rules (something we do not decide), the district court's other findings would remain unaffected. Finally, as with Rule 14(d), Marquette's challenges under Rules 5 through 8 repeatedly contest the district court's fact findings without showing clear error. For example, Marquette argues the court erred in finding the VANPORT "maintained a safe speed," claiming that the VANPORT's pre-collision speed increase "could not have been due to 'a fast river current.'" But Marquette fails to develop an argument that this conclusion was clearly erroneous.

**C.**

We turn to Deloach's cross-appeal. Deloach contends the district court erred in assigning the VANPORT 30% of the liability for the collision. We disagree.

No. 19-30311

We review "a trial court's finding on apportionment of relative fault in a maritime collision" only for clear error. *In re Settoon Towing, L.L.C.*, 859 F.3d 340, 344 (5th Cir. 2017) (citing *Tokio Marine & Fire Ins. Co. v. FLORA MV*, 235 F.3d 963, 970 (5th Cir. 2001)). Our review is "deferential," and we will not second-guess the district court's weighing of the facts. *Id.* at 353. "Even if we might have given different weight to different pieces of evidence than did the district court, this is not a reason to disturb that court's findings of relative responsibility, absent a showing of clear error." *Id.* (alteration omitted) (quoting *Tokio Marine*, 235 F.3d at 971). Our deference "is particularly important in a bench trial where the district court's opportunity to judge the witnesses' credibility weighs strongly." *Id.* (citing *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 375 (5th Cir. 2000)). Even if the district court fails to "provide a detailed explanation for its apportionment of fault," we presume that "it made the requisite allocation of fault based on the facts before it." *Id.* at 353.

Deloach fails to identify clear error. Deloach first argues Vidrine was "the essentially innocent party," claiming the court's allocation of fault to Deloach "was based solely on Vidrine's verbal assent . . . to Jackson's dual message that he would begin topping-around but knew he had to stay out [sic] VANPORT's way." This ignores the court's findings that Vidrine could have seen the JUSTIN on the VANPORT's Rose Point display and that he "should have known that it was too early for the JUSTIN to begin its turn." Moreover, Deloach's argument does not touch the court's finding that Vidrine should have clarified his understanding of the JUSTIN's position and intentions and that this failure was partially responsible for the collision.

For the same reason, we reject Deloach's argument that Vidrine "was not negligent in giving his assent" to the JUSTIN to top around. According to Deloach, Vidrine's understanding that the JUSTIN intended to stay in the slack water under the fleet instead of swinging out into the channel was

objectively reasonable, such that Vidrine cannot be faulted for approving that plan. But this argument founders on the district court's fact finding that Vidrine should have clarified his understanding and that his failure to do so led to the collision.[13] Here, again, we see no clear error.

Relatedly, Deloach argues Vidrine did not give the JUSTIN permission to top around in the navigational channel. It claims that had the JUSTIN stayed in the slack water as Vidrine had understood, the accident would not have taken place, and that "Vidrine had no choice but to rely on Jackson to perform his maneuver competently." This argument again fails to grapple with the district court's finding that Vidrine could have prevented the incident by making clearer his understanding of the JUSTIN's location and intentions.

In sum, Deloach fails to pinpoint any clear error in the district court's allocation of 30% liability to the VANPORT.

### D.

Finally, we address Deloach's argument that it was owed prejudgment interest as a prevailing maritime party. We remand the matter to consider whether prejudgment interest is appropriate.

"Under maritime law, the awarding of prejudgment interest is the rule rather than the exception, and, in practice, is well-nigh automatic." *Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1028 (5th Cir. 1986) (citing *Inland Oil & Transp. Co. v. Ark-White Towing Co.*, 696 F.2d 321, 327 (5th Cir. 1983)). The district court's decision to award or withhold prejudgment

---

[13] For similar reasons, we also reject Deloach's argument that Vidrine's failure to "remind Jackson" to stay clear of the VANPORT was not negligent. Vidrine's understanding about how the JUSTIN intended to maneuver, even if reasonable, did not alleviate the need for Vidrine to communicate clearly with Jackson to avoid a collision.

interest is reviewed for abuse of discretion, but "[a] trial court has the discretion to deny prejudgment interest only where peculiar circumstances would make such an award inequitable." *Id.* (citing *Inland Oil*, 696 F.2d at 327).

Here, neither the district court's order nor its judgment awards or denies prejudgment interest. Unable to locate any findings about the propriety of prejudgment interest, we are unable to review Deloach's argument. We therefore remand for the limited purpose of considering prejudgment interest. *Cf. Whitfield v. Lindemann*, 853 F.2d 1298, 1306 (5th Cir. 1988) (remanding to determine propriety of prejudgment interest and noting lack of analysis "makes it difficult to weigh the propriety of the district court's exercise of discretion").

\* \* \*

We AFFIRM the district court's judgment apportioning fault between the parties. We REMAND solely to determine whether prejudgment interest is proper and, if so, in what amount.