# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 6, 2021

Lyle W. Cayce
Clerk

No. 20-50200

Karin Kristensen, *individually and as administratrix of* The Estate of Dawn Larson Giffa; Donald Larson; Ciera Larson, *as guardian and next friend of* K.L., *a minor*; Michael Farina, *individually and as personal representative of* The Estate of Lydia Farina, *and as next friend of* J.W.F., E.F., M.F., and K.F., *all minor children*; Beverly Merrick; Christina Guzman, *individually and as personal representative of* The Estate of Steven Guzman, *as guardian and next friend of* M.G., *a minor*; Marina Lynn Ellis,

*Plaintiffs—Appellants*,

*versus*

United States of America,

*Defendant—Appellee*.

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:17-CV-126

---

Before Wiener, Costa, and Willett, *Circuit Judges*.
Don R. Willett, *Circuit Judge*:

The Fort Hood military community is no stranger to tragedy. It has endured several incidents of heartbreak and bloodshed, including this 2015 rampage in which a soldier stationed at Fort Hood fatally shot two of his

neighbors, his wife, and then himself. The victims' families sued the United States under the Federal Tort Claims Act. Following a bench trial, the district court entered final judgment in favor of the United States and dismissed the case with prejudice. We affirm.

I

Specialist Atase Giffa (SPC Giffa), an active-duty enlisted soldier, was stationed at Fort Hood in Texas. SPC Giffa was "a pretty average soldier" within his company, and, prior to this tragic event, he was not "flagged for anything."

SPC Giffa lived off-base in a civilian neighborhood with his wife, Dawn Larson Giffa, and her son from a previous relationship. The Giffas lived two houses down the street from Michael and Lydia Farina and their children. The Giffas lived across the street from Christina and Steven Guzman and their children. The Giffas were friends with the Farinas and the Guzmans.

In early 2015, SPC Giffa returned home from Army airborne school. Upon his return, the Giffas began to have marital issues stemming from SPC Giffa's upcoming transfer to Fort Bragg in North Carolina.

On February 9, 2015, SPC Giffa and Ms. Giffa had a physical altercation in the driveway of their home. After the altercation, Ms. Giffa called the Killeen Police Department (KPD); Officer Harris went to the Giffas' home, spoke separately with Ms. Giffa and SPC Giffa, and prepared a report.

According to the report, Ms. Giffa called the KPD, stating that "she was assaulted by her husband and she struck him in the head to defend herself." Ms. Giffa told Officer Harris that she had told SPC Giffa that she wanted to leave him, and then they started arguing. During the argument, Ms. Giffa discovered that her social security card and green card were

No. 20-50200

missing; she asked SPC Giffa if he had them, which he denied.[1] Ms. Giffa then searched SPC Giffa's vehicle, did not find her cards, and took his military identification card. SPC Giffa reached behind Ms. Giffa's back to grab her wrist to get his card; Ms. Giffa then threw SPC Giffa's card behind his back and slapped him on the face. In her report, Officer Harris listed SPC Giffa as the victim and Ms. Giffa as the offender. Officer Harris also looked for, and did not see, any visible marks on Ms. Giffa. Ms. Giffa did not report that she was hurt when SPC Giffa grabbed her wrist, and she did not express any concern that SPC Giffa would physically harm her.

That same day, one of SPC Giffa's superiors notified Major Miller, SPC Giffa's commander, about the Giffas' physical altercation. When the Army receives a report of domestic violence involving a servicemember, three Army regulations are triggered: (1) Army Regulation 608-18 (AR 608-18), which details garrison staff responsibilities for handling reports of domestic abuse; (2) Department of Defense Instruction 6400.06 (DODI 6400.06), which sets forth certain procedures for Army company commanders to  follow when responding to domestic abuse reports; and (3) Fort Hood Commanding General's Policy Letter #3 (Policy Letter), which specifies the responsibilities of the Family Advocacy Program at Fort Hood.

Major Miller also spoke to SPC Giffa on the same day as the Giffas' physical altercation. Major Miller issued a no-contact order, which required SPC Giffa to stay 500 feet away from Ms. Giffa and to remain in barracks (and away from his home) for a mandatory cooling off period.

The next day, Major Miller met with SPC Giffa, Ms. Giffa, and other Army personnel at Fort Hood to discuss the Giffas' physical altercation and

---

[1] Ms. Giffa is a Canadian citizen and lawful permanent resident of the United States.

No. 20-50200

Ms. Giffa's allegations that SPC Giffa had stolen her social security card and green card.

During the meeting, Major Miller referred Ms. Giffa to an Army Victim Advocate, whom Major Miller called on Ms. Giffa's behalf. Ms. Giffa met with Kendra Williams, the Victim Advocate, that same day. Williams went over a safety plan with Ms. Giffa; the safety plan provides victims with the name of, and information about, a local, secured shelter. Williams also informed Ms. Giffa about the Army's emergency relief fund, which provides victims with relocation funds if they do not wish to go to the secured shelter. Ms. Giffa chose instead to live with the Farinas, her neighbors.[2] Finally, Williams referred Ms. Giffa to the Army's Family Advocacy Program.

After the meeting, Major Miller filed a report and spoke with her supervising officer about the Giffas' physical altercation. That day, Army officers also went to the Giffas' home to look for Ms. Giffa's cards and to survey the condition of the home. The officers did not find Ms. Giffas' cards, and they did not see any guns, gun cleaning kits, ammunition, or other indications of violence in the home.

On February 12, three days after the Giffas' physical altercation, the Family Advocacy Program at Fort Hood received notice of the altercation. On February 17, Gwendolyn Farmer, the social worker assigned to the Giffas' case, learned about the Giffas' physical altercation and about Ms. Giffa's allegations of theft against SPC Giffa. Farmer spoke with command about whether SPC Giffa's transfer to Fort Bragg should be postponed or cancelled pending the investigation and scheduled a meeting to speak with SPC Giffa.

---

[2] Officer Harris' report also states that Ms. Giffa intended to stay with her neighbors.

No. 20-50200

On February 19, Farmer met with SPC Giffa to begin the investigation. During the hour-long meeting, SPC Giffa completed a behavioral health intake psychosocial history and assessment, on which he indicated that he was having issues with his wife. Farmer went over the safety plan with SPC Giffa and completed a risk assessment worksheet, which lists different spousal abuse characteristics. Farmer rated SPC Giffa as "mild" for most categories of the risk assessment. Farmer planned to meet with Ms. Giffa a few days later, but, due to the tragic, intervening events giving rise to the claim in this case, that meeting never occurred.

On the night of February 22, SPC Giffa called Ms. Giffa, and she gave him permission to come to the Farinas' home where she had been living since the physical altercation. SPC Giffa asked Ms. Giffa if she would return to their home; after she refused, SPC Giffa left and came back about 10 minutes later with a gun, which he had lawfully purchased the day before.

Upon his return, SPC Giffa shot and killed Ms. Farina in the Farinas' garage. Mr. and Ms. Guzman heard the shot from their home and walked over to the Farinas' property. SPC Giffa shot Ms. Guzman twice in the Farinas' garage; Ms. Guzman managed to escape to her home and survive her injuries. SPC Giffa shot and killed Mr. Guzman in the Farinas' home. SPC Giffa then dragged Ms. Giffa back to their home where he beat, shot, and killed her before he committed suicide.

The plaintiffs—family members of the three deceased victims—brought an action against the United States under the Federal Tort Claims Act (FTCA), alleging that the United States was liable for the Fort Hood Army employees' negligent performance of services under the three Army regulations, which were triggered by the report about the Giffas' physical altercation.

The United States moved for summary judgment, but the district court allowed the case to proceed to trial "given the seriousness of the

No. 20-50200

matter." After a two-week bench trial, the district court determined that (1) the United States had sovereign immunity under the intentional tort exception of the FTCA as to the claims brought by the plaintiffs, other than Ms. Giffa and her child, and (2) the United States did not negligently undertake a duty to any of the plaintiffs, including Ms. Giffa and her child. The district court also found that the plaintiffs had failed to show proximate causation because SPC Giffa's actions were not foreseeable by the Army. The district court entered final judgment in favor of the United States, dismissing the case with prejudice. The plaintiffs timely appealed.

## II

We review a bench trial's findings of fact for clear error and its conclusions of law de novo.[3] "A finding of fact is clearly erroneous if it is without substantial evidence to support it, the court misinterpreted the effect of the evidence, or this court is convinced that the findings are against the preponderance of credible testimony."[4] There is a "strong presumption" that we should sustain the district court's findings, even though we "might have weighed the evidence differently."[5] And we show "even greater deference to the trial court's findings when they are based on determinations of credibility."[6] Therefore, we should not upset the district court's findings

---

[3] *Villafranca v. United States*, 587 F.3d 257, 260 (5th Cir. 2009). *See also* Fed. R. Civ. P. 52(a)(6) ("Findings of fact . . . must not be set aside unless clearly erroneous . . . .").

[4] *Becker v. Tidewater, Inc.*, 586 F.3d 358, 365 (5th Cir. 2009).

[5] *Deloach Marine Servs., L.L.C. v. Marquette Transp. Co., L.L.C.*, 974 F.3d 601, 607 (5th Cir. 2020).

[6] *Id.* (cleaned up). *See also* Fed. R. Civ. P. 52(a)(6) ("[T]he reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.").

No. 20-50200

of fact unless "we are left with the definite and firm conviction that a mistake has been committed."[7]

## III

Because the allegedly negligent act occurred in Texas, the FTCA relies on Texas law to govern the issue of the United States' liability.[8] To maintain a negligence claim under Texas law, a plaintiff must show "the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach."[9] If the plaintiffs fail to show just one of these elements, then their entire negligence claim fails. Accordingly, we can limit our review to a single element of the negligence claim and affirm on that basis.[10]

The plaintiffs raise six arguments concerning different elements of their negligence claim: four address the duty element; one addresses the breach element; and one addresses the proximate causation element. Because the plaintiffs' failure to show proximate causation is dispositive, we address only that issue.

We begin by providing the relevant law on proximate causation. Then we discuss the district court's finding on proximate causation, which is a

---

[7] *Deloach Marine Servs.*, 974 F.3d at 607 (cleaned up).

[8] 28 U.S.C. §§ 1346(b), 2674. *See also Urbach v. United States*, 869 F.2d 829, 831 (5th Cir. 1989).

[9] *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004). *See also Allen v. Walmart Stores, L.L.C.*, 907 F.3d 170, 178 (5th Cir. 2018) (citing Texas caselaw).

[10] *See, e.g.*, *Batten v. United States*, 200 F.3d 816 (5th Cir. 1999) (unpublished) (addressing only the district court's finding of no proximate causation when reviewing the district court's determinations, following a bench trial, that the defendant owed no duty and that defendant did not proximately cause the harm to the plaintiffs).

No. 20-50200

question of fact that we review for clear error.[11] Finally, we turn to the plaintiffs' arguments. Because the district court did not commit clear error in finding that the harm to Ms. Giffa and the neighbors was not foreseeable to the Army, we affirm.

## A

Under Texas law, a plaintiff must show both foreseeability and cause in fact to establish proximate causation.[12] Only the former, foreseeability, is at issue in this appeal. "Foreseeability requires that the injury complained of be of such a general character as might reasonably have been anticipated from the defendant's conduct."[13] "Generally, a person's criminal conduct is a superseding cause extinguishing liability of a negligent actor" unless the criminal conduct was a foreseeable result of that negligence.[14]

So, to show proximate causation, the plaintiffs needed to establish that Ms. Giffa's and the neighbors' deaths were of such a general character that the Army might have reasonably anticipated their deaths when performing services for the Giffas under the three Army regulations. Plus, the plaintiffs had to show that SPC Giffa's conduct was a foreseeable result of the Army's alleged negligence.

## B

The district court found that the plaintiffs failed to make this showing. The district court noted that there were "no red flags regarding SPC Giffa's

---

[11] *Urbach*, 869 F.2d at 831.

[12] *IHS Cedars Treatment Ctr.*, 143 S.W.3d at 798.

[13] *Skipper v. United States*, 1 F.3d 349, 352 (5th Cir. 1993) (cleaned up).

[14] *El Chico Corp. v. Poole*, 732 S.W.2d 306, 313–14 (Tex. 1987), *superseded by statute on other grounds as stated in F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680 (Tex. 2007).

behavior" preceding the horrific events on February 22. And the district court observed that the evidence at trial showed that "the Army was getting mixed messages about who was the victim" of the February 9 physical altercation between SPC Giffa and Ms. Giffa. The district court reviewed the evidence and found that the murders and shootings committed by SPC Giffa "could not have been reasonably anticipated by the Army." The district court also found that SPC Giffa's killings were "a superseding, unforeseeable event that could not have been anticipated by the Army based on the information they had during that 12-day period" between the February 9 altercation and the February 22 killings. The district court thus determined that the plaintiffs failed to prove that the Army's alleged breach was the proximate cause of the plaintiffs' injuries.[15]

## C

The plaintiffs challenge the factual and legal bases of the district court's finding that the harm to Ms. Giffa and the neighbors was not foreseeable. First, they claim that the district court's finding went against the great weight of the evidence. But substantial evidence supports the district court's foreseeability finding, including: Farmer's credible testimony that SPC Giffa was low risk on spousal abuse characteristics based on her initial assessment; Major Miller's credible testimony that SPC Giffa was an average soldier and that no Army personnel were aware of domestic disturbances between Ms. Giffa and SPC Giffa before the February 9 physical altercation; Officer Harris' credible testimony that SPC Giffa and Ms. Giffa were calm when she spoke with them immediately after the February 9 physical altercation; and the Fort Hood officers' report that there

---

[15] The district court also determined that the testimony of the plaintiffs' expert, Dr. Deutsch, who surmised that the Army's alleged violations of the regulations was the proximate cause of the plaintiffs' injuries, was not credible.

No. 20-50200

were no weapons or signs of domestic disturbances discovered during their search of the Giffas' home. The foregoing evidence involves determinations of credibility, so we must show even greater deference to the district court on its finding of proximate causation. Thus, we find no clear error.

The plaintiffs next contend that the district court used an incorrect legal standard for foreseeability. They claim that the district court should have focused on what Williams, the Victim Advocate, and the Family Advocacy Program reasonably should have known, rather than what Farmer, the social worker, knew. The plaintiffs also assert that the district court "failed to evaluate what would have been known to" Farmer, had she completed her investigation before the February 22 killings. They claim that, if Farmer had finished the investigation, she would have foreseen the harm to Ms. Giffa and the neighbors. This argument fails. The district court found Farmer to be credible, and the undisputed evidence showed that, even if she had received additional information, such as Officer Harris' report of the February 9 altercation, Farmer would not have changed her February 19 assessment of SPC Giffa as low risk on spousal abuse characteristics because the report listed SPC Giffa as the victim and would not have alerted her. The plaintiffs claim that the district court "prevented the cross-examination of the Army's expert psychologist . . . on what assessment should have been done" by Farmer. Even if cross-examination would have changed the district court's credibility determination for Farmer, the district court did not base its finding solely on Farmer's testimony. Instead, the district court supported its foreseeability finding with additional, substantial evidence, including Major Miller's testimony, Officer Harris' testimony, and the Army's search of the Giffas' home.

The plaintiffs also point to Williams' testimony that she foresaw the danger to Ms. Giffa, and they argue that the district court should have given that testimony substantial weight. This argument also fails. The district court

was charged with making credibility assessments. The district court did not find Williams' testimony to be credible, and we must defer to that determination.

Finally, the plaintiffs argue that the three Army regulations—AR 608-18, DODI 6400.06, and the Policy Letter—render SPC Giffa's killings foreseeable. Specifically, they claim that "[i]t is foreseeable that not following domestic violence regulation program[s] can lead to violence." This argument overlooks what the plaintiffs had to show to establish proximate causation; namely, that Ms. Giffa's and the neighbors' deaths were of such a general character that the Army might reasonably have anticipated their deaths when performing services for the Giffas under the three Army regulations and that SPC Giffa's conduct was a foreseeable result of the Army's alleged negligence. The plaintiffs failed to make that showing, and the district court did not commit clear error in making that finding.

## IV

The Fort Hood military community is well acquainted with heartache. Our hearts go out to the families, soldiers, and friends affected by this horrific tragedy. But we are duty-bound to apply Texas law, which requires the plaintiffs to show that the Army's alleged breach was the proximate cause of their injuries. Because the plaintiffs cannot show that the harm to Ms. Giffa and the neighbors was foreseeable to the Army, their negligence claim against the United States fails. We thus AFFIRM the district court's dismissal of their case with prejudice.