# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 26, 2023

Lyle W. Cayce
Clerk

———————

No. 22-30178

———————

Kirk Menard,

*Plaintiff—Appellee*,

*versus*

Targa Resources, L.L.C.,

*Defendant—Appellant*.

———————————————————

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:19-CV-50

———————————————————

Before King, Stewart, and Haynes, *Circuit Judges*.

Per Curiam:[*]

Targa appealed the district court's order concluding that its former employee, Kirk Menard, was entitled to protection under the Louisiana Environmental Whistleblower Statute ("LEWS") for refusing to comply with a manager's illegal directive. In our January 6, 2023, opinion, we certified questions to the Louisiana Supreme Court regarding whether Menard engaged in "protected activity" under LEWS. *Menard v. Targa Res.,*

———————————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 22-30178

*L.L.C.*, 56 F.4th 1019, 1024 (5th Cir. 2023). On June 27, 2023, the Louisiana Supreme Court answered these questions and confirmed that it was. *See* No. 2023-CQ-00246, 2023 WL 4195779, at *5 (La. June 27, 2023).[1] This leaves us with one final issue to resolve—whether Menard met his burden to show that this "protected activity"[2] was the but-for cause of his termination. We conclude that he has made this showing, and we therefore AFFIRM.

## I.    Background

Our prior opinion summarizes much of this case's relevant factual background and procedural history. *See Menard*, 56 F.4th at 1021. In sum, after Menard was fired by Targa, he sued the company contending that his termination was retaliation for protected conduct in violation of LEWS. *Id.* at 1021. Turning to Targa's version of the events, it disagrees that it terminated Menard in retaliation for his refusal to comply with Manager Perry Berthelot's illegal directive. Rather, Targa contends it fired Menard

---

[1] Specifically, we asked the following, both of which the Louisiana Supreme Court answered "yes":

> (1) Whether refusals to engage in illegal or environmentally damaging activities are "disclosures" under the current version of the Louisiana Environmental Whistleblower Statute, La. Stat. Ann. 30:2027; and
> (2) Whether the Louisiana Environmental Whistleblower Statute affords protection to an employee who reports to his supervisor an activity, policy, or practice of an employer which he reasonably believes is in violation of an environmental law, rule, or regulation, where reporting violations of environmental law, rules, or regulations, is a part of the employee's normal job responsibilities.

56 F.4th at 1024.

[2] Menard urges that Targa retaliated against him for (1) refusing to follow Berthelot's directive *and* (2) reporting the directive to his official supervisor. The Louisiana Supreme Court held that these are both "protected activities" under LEWS. *See* 2023 WL 4195779, at *5—6. However, because we conclude Menard established his LEWS claim based on the former, we do not address the latter.

due to "performance issues" and several incidents of inappropriate workplace conduct.

Targa provides the following account: Four days after the call with Berthelot, Menard's "indirect supervisor," Tim Keller, received complaints about Menard's behavior. Specifically, some of Menard's co-workers alleged Menard had shown them intimate pictures of his partner's medical condition and made crude comments about their wives. Keller subsequently relayed this information—along with his concerns about Menard's performance—to Menard's "official" supervisors and members of Targa's human resources ("HR") department. These HR representatives then met with Jessica Keiser, a Targa Senior Vice President, who ultimately decided to fire Menard. Menard disputed much of this account, and he presented conflicting evidence in response to Targa's motion for summary judgment. The district court found that this evidence raised several genuine disputes of material fact, precluding summary judgment for Targa. Following a bench trial, the district court issued an opinion finding for Menard "in all respects" and entered judgment in his favor.

## II.　Jurisdiction & Standard of Review

The district court had diversity jurisdiction under 28 U.S.C. § 1332(a). We have appellate jurisdiction over the district court's final order under 28 U.S.C. § 1291. Additionally, we may review Targa's challenges to the district court's denial of its motion for summary judgment to the extent they address the court's rulings on "issue[s] of law."[3] *Becker v. Tidewater, Inc.*, 586 F.3d 358, 365 n.4 (5th Cir. 2009).

---

[3] This is an exception to the general rule that orders denying summary judgment are not reviewable "when final judgment adverse to the movant is rendered on the basis of

No. 22-30178

We review a district court's legal rulings in an order denying summary judgment de novo. *Tanks v. Lockheed Martin Corp.*, 417 F.3d 456, 461 (5th Cir. 2005). The standard of review for an order following a bench trial is bifurcated: we review findings of fact for clear error and legal conclusions and mixed questions of law and fact de novo. *Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 294 (5th Cir. 2009). We will only disturb the district court's findings of fact if we are "left with the definite and firm conviction that a mistake has been committed." *Deloach Marine Servs., L.L.C. v. Marquette Transp. Co., L.L.C.*, 974 F.3d 601, 606–07 (5th Cir. 2020) (quotation omitted). We grant "even greater deference to the trial court's findings when they are based on determinations of credibility." *Id.* at 607 (quotation omitted). There is "a strong presumption that the [district] court's findings must be sustained even though [we may] have weighed the evidence differently." *Id.* (quotation omitted).

## III.   Discussion

LEWS bars employers from "act[ing] in a retaliatory manner" towards an employee who engages in conduct the Statute protects. LA. R.S. 30:2027(A). Given that Menard's retaliation claim relies on a pretext theory, "our analysis is governed by the well-known *McDonnell Douglas* test and its burden-shifting framework." *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 805 (5th Cir. 2007). "Under th[is] framework, the employee's ultimate burden is to prove that the employer's stated reason for the adverse action was merely a pretext for the real, retaliatory purpose." *Septimus v. Univ. of Hous.*, 399 F.3d 601, 608 (5th Cir. 2005). To accomplish

---

a full trial on the merits." *Blessey Marine Servs., Inc. v. Jeffboat, L.L.C.*, 771 F.3d 894, 897 (5th Cir. 2014) (quotation omitted).

this, Menard needed to establish that Targa would not have discharged him "'but for' [his] protected conduct." *Id.*

After considering the parties' evidence, the district court concluded that Menard satisfied this burden. It provided several interrelated reasons. First, the district court emphasized the close temporal proximity (six days) between Menard's phone call with Berthelot and his discharge.[4] Second, the district court cited extensive evidence discrediting Targa's witness testimony and its proffered rationale for Menard's discharge. For example, the district court noted: (1) Keller's inability to provide specific details about Menard's allegedly defective work performance; (2) numerous inconsistencies between Keller's and the reporting employees' accounts of Menard's allegedly inappropriate conduct; (3) the lack of any records of inappropriate conduct in Menard's personnel file; and (4) Berthelot's failure to recall any of the details of his conversation with Menard.

Third, the district court found that other evidence supported Menard's contention that his refusal was the but-for cause of his termination. The court acknowledged that it was undisputed that the ultimate decisionmaker—Keiser—lacked the requisite retaliatory animus. However, it reasoned that the evidence nonetheless supported Menard's allegations that Berthelot and Keller retaliated against him by improperly influencing Keiser through Keller's negative reports. This, the court reasoned, was sufficient to establish but-for causation under a "cat's paw" framework.

Under this theory of liability, courts may impute an agent's improper motive to a de facto decisionmaker upon a showing that the agent

---

[4] Indeed, under our precedents, temporal proximity (particularly this close), while insufficient in isolation, constitutes evidence of pretext. *See Watkins v. Tregre*, 997 F.3d 275, 284–86 (5th Cir. 2021); *Strong*, 482 F.3d at 807–08.

(1) exhibited the requisite retaliatory animus, and (2) possessed leverage, or exerted influence, over the titular decisionmaker. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226–27 (5th Cir. 2000). The district court determined both prongs were satisfied based on evidence that: (1) Berthelot was Keller's direct supervisor; (2) Keller had had "plenty of time" to speak with Berthelot after the phone call and before Keller's report to HR; and (3) Keiser based her decision to terminate Menard *solely* on Keller's report— that is, neither she nor the HR Representatives independently investigated Keller's allegations. Taken together, the district court reasoned, this circumstantial evidence invited the reasonable inference that (1) Berthelot imputed his retaliatory animus to Keller, and (2) Keller, in turn, "used" Keiser "to bring about the intended retaliatory action."

Targa challenges this reasoning on two fronts. First, Targa argues that to satisfy the cat's paw analysis, Menard needed to show that the *same* party both harbored retaliatory animus and influenced the final decisionmaker. Yet, Targa argues, Menard's evidence at most showed that Berthelot had the requisite motive and Keller influenced Keiser.

Of course, the district court found that Keller *did* possess the requisite retaliatory animus—it credited evidence indicating Keller and Berthelot conspired together to have Menard terminated in the days following the phone call.[5] To the extent Targa asks us to second-guess the district court's factual findings and credibility determinations, we decline. *See Deloach*, 974

---

[5] The district court cited extensive evidence supporting this theory beyond Keller's aforementioned admission that he would've had time to talk to Berthelot in the days following the phone call. For instance, the court noted that Keller conceded at trial that he had told Menard on multiple occasions that if Menard "made [] Berthelot look bad[,] [] it would not be good." Additionally, Keller testified that four days after the phone call, he told Berthelot he planned to report Menard to HR—*even though Menard "was not in Berthelot's chain of command."*

F.3d at 607. But Targa's greater point seems to be that this "causal chain"—in which the requisite animus purportedly passed from Berthelot, to Keller, to HR, to Keiser—is too attenuated to establish but-for causation, even under a "cat's paw" theory. In other words, Targa seems to contend that Menard was required to show that the person who leveraged the decisionmaker was also the *original* source of any improper motive.

We refuse to adopt this rigid construction of the cat's paw theory. In *Staub v. Proctor Hospital*, the Supreme Court explicitly rejected the notion that intermediary "exercise[s] of judgment" necessarily make the link to an agent's retaliatory motive excessively "'remote' or 'purely contingent.'" 562 U.S. 411, 419 (2011). The cat's paw theory recognizes that because "[t]he one who makes the ultimate decision" often "does so on the basis of performance assessments by other supervisors," supervisors may cause an employee's discharge by leveraging other employees and submitting false reports. *Id.* at 421. Failing to account for this possibility, the Court noted, would "effectively shield[]" an employer from retaliatory "acts and recommendations of supervisors that were *designed and intended* to produce the adverse action." *Id.* at 420 (emphasis in original). Accordingly, the cat's paw framework is not a mechanical, extra-textual test for assessing liability. Rather, it aims to focus the court on its central task—determining whether retaliatory animus caused an adverse employment action. *See Long v. Eastfield Coll.*, 88 F.3d 300, 307 (5th Cir. 1996) (indicating the key determination under a cat's paw analysis is whether "the causal link between [the supervisor's] allegedly retaliatory intent and [the employee's] termination[] would be broken"). Because this is exactly the analysis the district court conducted, we reject Targa's first point of error.

Second, Targa urges that Menard failed to show that Keller "leverage[d]" or "influence[d]" Keiser. *See Russell*, 235 F.3d at 226. Rather, Targa asserts, the evidence establishes that Keiser based her decision

on a "good faith" belief that Menard engaged in the conduct Keller reported. But this, too, misses the point. First, under our precedent, evidence that an ultimate decisionmaker "rubber stamp[ed]" a biased supervisor's termination recommendation typically satisfies the second prong of the cat's paw analysis. *See Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 171 (5th Cir. 2014); *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122–23 (5th Cir. 1998). That's exactly what the district court determined transpired here. To the extent Keiser asserted otherwise at trial, the district court cited reasonable grounds for discrediting her testimony.[6]

Along the same lines, Targa confuses "good faith" for "blind faith." Keiser couldn't have demonstrated "good faith" reliance on Keller's allegations—it was undisputed that both she and Targa's HR Representatives accepted his report at face value without making any attempt to validate its veracity.[7] Again, the very *purpose* of the cat's paw theory is to prevent employers from escaping liability by passively facilitating such retaliatory acts. Therefore, this argument also fails.[8]

---

[6] Indeed, the district court noted that Keiser couldn't recall numerous important details relevant to her termination decision, including anything about Menard's employment with Targa or which employees witnessed Menard's alleged inappropriate conduct.

[7] Moreover, Targa relies on our statement in *Waggoner v. City of Garland*, 987 F.2d 1160 (5th Cir. 1993) that "[t]he real issue is whether the employer reasonably believed the employee's allegation and acted on it in good faith." *Id.* at 1165. But *Waggoner* didn't implicate a cat's paw analysis, and therefore it's inapplicable here.

[8] Targa also asserts that the district court erred by mistakenly stating that Menard's protected activity was Berthelot's *request* for Menard to dilute the samples. But given that the rest of the court's order makes clear that the protected activity at issue was Menard's *refusal* to follow this directive, this writing mistake is plainly not reversible error. *See S.S. Silberblatt, Inc. v. U.S. for Use & Benefit of Kambert Corp.*, 353 F.2d 545, 549 (5th Cir. 1965) (noting that the district court is only required to detail its findings so as to "indicate the factual basis for [its] ultimate conclusion") (quotation omitted).

No. 22-30178

## IV.    Conclusion

For the reasons discussed, we agree that, given the district court's factual findings, Menard met his burden to show that but for his protected activity he would not have been discharged.  We AFFIRM the district court's denial of Targa's motion for summary judgment and the final judgment in favor of Menard.